IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 1:17-777 |
| v. | |
| **JOHN U. CARROLL**<br>**ANN CARROLL**<br>**COURTNEY CARROLL**<br>**JAY G. CARROLL**<br>**MARY C. CARROLL**<br>**MARY RITA CARROLL**<br>**RALPH CARROLL**<br>**MARY GORMAN**<br>**TINA GORMAN**<br>**ANN MACK**<br>**THOMAS MARTIN MACK**<br>**RACHEL MCNALLY**<br>**BILLY O'HARA**<br>**JIM O'HARA**<br>**WINNE O'HARA**<br>**HUGH RILEY**<br>**MELISSA RILEY**<br>**TRACY RILEY**<br>**BETTY SHERLOCK**<br>**M. LISA CARROLL SHERLOCK**<br>**MICHAEL P. SHERLOCK**<br>**PATRICIA SHERLOCK**<br>**PATRICK SHERLOCK**<br>**SANDRA SHERLOCK**<br>**ANN F. SHERLOCK** | SENTENCING MEMORANDUM |

The 11(c)(1)(C) sentence that instituted an agreed upon guideline sentence of Racketeering is reasonable and correct to account for the pattern of criminal conduct that the defendants have engaged in and a Guideline sentence is supported by the 3553(a) factors. The defendants named above along with others, engaged in a criminal Conspiracy/Enterprise that consists of members and associates of the Travelers of Murphy Village. *See* case 1:16-632. Each defendant plead guilty

to a conspiracy to further this Conspiracy/Enterprise. The conspiracy/Enterprise is an association that is involved in wide-ranging fraud, including Food Stamp fraud, Medicaid fraud, life insurance fraud, car loan fraud, and tax fraud, as well as the laundering of proceeds of the life insurance fraud.  The investigation revealed that fraud is endemic throughout Murphy Village, constituting a culture of criminality and that each defendant was prolific in criminal activities. The Government submits this sentencing memorandum to provide the Court with generalized information regarding this unique Conspiracy/Enterprise. Although, not every section applies to each defendant each defendant plead guilty to being a part of this Conspiracy/Enterprise. Sections 3553(a)(2)A-D and 3553(a)(3)-(6) have significant overlap between defendants. If in the course of sentencing individual issues are brought to the attention of the Court, the Government will address them individually.

## Background

As the Court is aware and detailed below, this investigation has been a long-term investigation into criminal Conspiracy/Enterprise that had previously operated for decades with impunity. The investigation's goals were to address the endemic criminal activity and doing so, make the future generations of Travelers lives' materially improved by not being dependent on criminal activity for a livelihood. This round of convictions comes  through the use of target letters, plea agreements, and the use of an Information. These defendants all agreed to plead guilty to an information – agreeing in a plea agreement that an appropriate guideline level would be a 19, based upon the consideration that the Government would Indict for 1962 (racketeering) – thereby triggering the guideline of 2E1.1 – minimum level of 19. Through the use of target letters, plea agreements, and the use of an Information, the defendants' minimized their exposure – this was beneficial to the Government as well, as time and resource consuming investigation and discovery

was limited. This limitation of the investigation dictates that the offense conduct contained in the pre-sentence reports are not as voluminous as found in the PSRs of 1:16-632. Moreover, the Government met with attorneys for each defendant to ensure that Government's understanding of each defendant's criminal culpability was correct – in doing so provided a *prima facia* showing of each defendant's guilt. It is this *prima facia* showing that is the basis for each PSR. The agreed upon level 19 is based upon the initial prosecution of *United States v. Hannah Carroll*, 1:16-632, and the underlying unique facts of this criminal Conspiracy/Enterprise. As detailed below, the agreed upon sentence of 19 is appropriate for each of the defendants, it fulfills the aims of 3553(a), and is sufficient, but not greater than necessary to achieve a just sentence.

## The Conspiracy/Enterprise

The conspiracy/Enterprise is an association in fact that includes members of the Traveler Community in Murphy Village and certain associates, hereinafter the conspiracy/Enterprise. The conspiracy/Enterprise has operated with impunity for decades; this is in many ways directly attributable to the unique operation of the conspiracy/Enterprise as detailed below, and the fact that the State of South Carolina has weak laws concerning criminal conspiracies and criminal enterprises.

### I.     Travelers of Murphy Village

Murphy Village is located near the state line of Georgia and on the county line between Aiken County and Edgefield County. Murphy Village is a community of approximately 2,500-4,000 individuals. The Travelers are a self-identified group who traditionally are itinerant workers and claim to be descendants of 19th-century Irish immigrants, hence Irish Travelers. While Travelers are located all over the nation, there are three large settlements or "camps," North Augusta – "Murphy Village;" Fort Worth, Texas – "White Settlement;" and Memphis, Tennessee

– "Oakhaven."  Traditionally, the men will go on the road to "travel" during the summer working across the country in various construction types of jobs.  The women usually do not work outside the home; instead, they are in charge of the household, including the finances.

The Murphy Village community is insular, with residents referring to non-residents as "country-people." The Travelers speak a dialect of pigeon English/Gaelic that they call Cant or Kant or "can't."  This language allows the Travelers to have open conversations in the presence of non-Travelers. Traditionally, the residents of Murphy Village do not participate fully in the educational system.  Traveler children are removed from schools between the fifth and eighth grades.  The boys will go to work with their fathers or family members.  The girls will remain in the homes with the mothers. Parties and celebrations are big in the Traveler community.  The boys' party that signifies manhood is the "car" party.  At the car party the boy's family advertises the boy's financial earning ability and what makes them desirable as a husband.  The boys' parties generally occur in the fall after their sixteenth birthday.  The girls' party that signifies womanhood is the First Holy Communion party.  The First Holy Communion Party happens in the spring when the girl is seven or eight. Once these parties occur for the boys and the girls, families begin to work on arraigned marriages.[1]  The boys are seen as being valuable, as they are the "earners." The girls' families will try to identify the top earners and arrange the marriage between the children.  Sometimes dowries are exchanged from the girl's family to the boy's family – the dowries are based upon life insurance policies: either the proceeds, or the gifting of a policy on someone who is thought to be short for the world.

The evidence showed, through testimony and interviews, that Murphy Village limits the education of its children, this is done by withdrawing both boys and girls from school between the

---

[1] *See* attached video of "prom," provided in discovery.

fourth and eighth grade. The reason espoused is that the boys have to go on the road with their fathers and the girls need to learn how to be mothers. The reason appears to more insidious: the lack of education deprives the children options to leave the community. The girls cannot leave the community; this along with arranged marriages to other Travelers holds the children captive in the community and ensures future generations of Travelers. Similarly, the boys are dependent on their father and family for training and work, thus preventing any opportunity for the boys to leave Murphy Village.

The men travel around the country doing various jobs such as paving, seal coating, painting, roofing, and selling tools or carpet and vinyl flooring. An examination of bank records shows a deposit history across the United States, often with checks over $10,000 that appear to be payment for construction type work. Some perform various burglary schemes and are known in the Traveler community as "yonks." In the Traveler community, demonstrations of extravagant wealth are used as a status symbol and to further the Conspiracy/Enterprise. These demonstrations of wealth are seen in gaudy homes, luxury automobiles, and lavish consumer items including clothes, jewelry and furs.

The Predicate Criminal Acts

II. <u>The Predicate Criminal Acts charged in the Information furthered the conspiracy/Enterprise</u>

A. <u>Life insurance fraud provides the Conspiracy/Enterprise the ability to generate wealth</u>

The life insurance fraud scheme is a significant manner in which wealth is obtained by the Conspiracy/Enterprise. In general, the men's jobs do not produce large incomes. They are door to door salesmen: selling tools or linoleum flooring, or the men are offering painting or asphalt work. Each member of the Conspiracy/Enterprise, who gave a statement or provided testimony, stated that the homes and high-end vehicles are purchased with life insurance proceeds. The life insurance

fraud supports the entire community, not just the insured. The life insurance policies are expressly for gaining wealth and it is not limited to the nuclear family of the insured. Life insurance policies are traded, bought, sold, and given as dowries – within the community. Moreover, once a desired person is successful in getting a policy, others in the community who have no insurable interest will began to get policies on the insured. The vital information of that person is given or sold by either the insured, a beneficiary of the original policy or by the insurance salesman. The conspiracy/Enterprise is benefitted and maintained because polices are sold across the conspiracy/Enterprise giving all the opportunity to participate in the ultimate reward, the life insurance death benefit.

A review of the bank records show excessive monthly expenses for insurance premiums and car payments. The investigation reviewed thousands of life insurance policy applications, the vast majority were fraudulent in their inception. The fraudulent misrepresentations include:

1. Income of the insured, the income of the insured provided a basis for the companies to determine how much life insurance to provide to each beneficiary - a general rule is that the maximum amount of life insurance that will be extended is seven to ten times the annual income of an insured.
2. Net worth of the insured, the net worth of the insured provided a basis for the companies to determine how much life insurance to provide to each beneficiary.
3. Employment of the insured, if the insured was employed was used to determine if the companies wished to extend a policy and if so at what rate.
4. Insurable interest, companies do not extend policies where the beneficiary does not have an insurable interest in the insured, i/e the beneficiary would endure a harm in the death of the insured, examples: son has an insurable interest in father or attorney has insurable interest in partner in the firm.
5. Address of the insured, the Conspiracy/Enterprise generally provided the address of the beneficiary as that of the insured. This was done to be able to control the information that is being provided to the companies.
6. Lack of other policies, the number of policy on the insured provided a basis for the companies to determine how much life insurance to provide to each beneficiary – a general rule is that the maximum amount of life insurance that will be extended is seven to ten times the annual income of an insured.

7. Mortgages held by the insured, certain life insurance policies were based upon the representations that the insured had a mortgage. These policies relied upon the banking industries decisions on whether to extend a mortgage to the insured – and provided coverage of to the insured of the amount of the mortgage. A review of the mortgage based policies found that there were no mortgages.
8. Health of the insured, as detailed, herein, policy are obtained on individuals with health conditions that make their end of life more likely.

The elderly of Murphy Village were insured at much higher rates than the average resident. In an interview of Margaret Sherlock who at the time was 84, she stated that she is probably "the richest person out here, after I die." She said that she has no idea how many policies are on her or who has them, however she recalled only speaking to one salesman. The investigation found at least 52 policies on Margaret. The policies listing the over 30 beneficiaries as either Margaret's son or daughter, Margaret had no children. Moreover, the many of the policies listed Sherlock as having substantial income and net worth.



An example of the practice of insuring the elderly can be seen in the average amount of time from the time that a policy is applied for and when the person dies:

Leonard New 4 years.

Wade Williamson 4.3 years.

The five other most prolific agents in the community, less than six years.

John F. Carroll was insured by at least 29 policies. John F. Carroll had a disease similar to leprosy that caused 1. a noticeable disfiguring and 2. extreme health issues – which lead to his death in 2017. On the 27 policies identified none listed any health condition. Like Margaret Sherlock, John F. Carroll's policies listed many of the beneficiaries as his children– though he never had any children.

 John F. Carroll

Another common practice was to insure outsiders where there was no insurable interest. Joseph Pugh had numerous policies on him claiming that various Travelers were kin to him

 Joseph Pugh

B.  The life insurance fraud is funded through other frauds.

The life insurance fraud is paid for by other fraud. The Conspiracy/Enterprise would not be able to exist in its current state without fraudulent proceeds. The benefit fraud allows for the Conspiracy/Enterprise to put food on the table and to pay for health care expenditures all with Government funds.  While the bank accounts for the named defendants generally show tens of

thousands if not hundreds of thousands of dollars flowing through the accounts, the benefit fraud allows the members to allocate money for insurance policy premiums or other costs as opposed to food and medical expenses. Similarly, money from the men traveling, be it legitimate work or scams, and the tax return fraud allows for members of the Conspiracy/Enterprise to pay bills/premiums until the large life insurance checks become available. As detailed by witnesses the fraudulent activity is to support the members until life insurance proceeds are deposited.

C. Proceeds from the fraud are structured out and laundered to continue the fraud.

The life insurance proceeds immediately following their deposit are withdrawn on consecutive days in amounts below the reporting requirement. Interviews and testimony showed this practice allows for the proceeds of policies to be distributed among payors, defeats law enforcement's investigations – into tax evasion and the tracing of funds, and defeats criminal seizure. The laundered and structured money further continues and sustains the goals of the community.

D. The proceeds of the life insurance fraud, continued and sustained the Conspiracy/Enterprise.

In the Conspiracy/Enterprise the appearance of wealth is closely related to status. The appearance is maintained through the purchase of large houses, expensive cars, and garish displays of wealth at parties. The Conspiracy/Enterprise by creating a competition of sorts in which families with young girls vying for the attention of young men whose families have benefitted most from the ultimate life insurance scam. The young men also compete for the attention of the girls who belong to families with the ability to pay large dowries with cash or the assignment of large face value life insurance policies. This keeps the Conspiracy/Enterprise afloat. Moreover, it is with the proceeds that additional policies can be acquired, as well as dowries paid or demanded.

E. <u>The Conspiracy/Enterprise facilitates the fraud</u>

The Conspiracy/Enterprise has identified a series of life insurance agents, tax preparers, car salesmen, and even a doctor that assist in all the aspects of criminality. These associates of the Conspiracy/Enterprise help to ensure that the specific crime is successfully completed. For instance, the life insurance agents help ensure that the fraudulent information on the policies is such so that the policies are approved. The agents assist in the sale and transfer of policies within the community. Once an agent is known to the Conspiracy/Enterprise to be willing to provide false information to assist in the obtaining of life insurance everyone flocks to them. It is similar with car dealerships, where the Conspiracy/Enterprise has identified a dealership that will co-conspire to commit fraud with them – the word is spread throughout the Conspiracy/Enterprise. The dealerships assists the Travelers in the submissions of fraudulent applications to obtain financing.

III. <u>The Court should deny the defendants' motions for a variance and should apply a Guideline sentence</u>

A Guideline sentence is reasonable and fulfills the purpose of the Guidelines. The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 125 S. Ct. 738, 760 (2005). In determining a sentence, "the Guidelines should be the starting point and the initial benchmark." *Peugh v. United States*, 133 S.Ct. 2072, 2080 (2013). Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary." A variance is based on the district court's consideration of the 18 U.S.C. § 3553(a) factors. If granted, a variance results in a sentence that diverges from the original guidelines calculation. In determining procedural reasonableness, the district court must properly calculate the defendant's advisory Guidelines range, considered the 18 U.S.C. § 3553(a) (2006)

factors, analyzed any arguments presented by the parties, and sufficiently explained the selected sentence. Id. "Regardless of whether the district court imposes an above, below, or within-Guidelines sentence, it must place on the record an individualized assessment based on the particular facts of the case before it." *United States v. Carter*, 564 F.3d 325, 330 (4th Cir.2009) (internal quotation marks and footnote omitted). "[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation." *Rita v. United States*, 551 U.S. 338, 356 (2007). The sentencing court need only show "'that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decision making authority.' " *Id*. An explanation is adequate when it "allow[s] for meaningful appellate review and ... promote[s] the perception of fair sentencing." *Gall v. United States*, 522 U.S. 38, 50 (2007). In reviewing the reasonableness of a sentence appellate courts may apply a presumption of reasonableness to a guideline sentence. *Gall*, 522 U.S. at 51, *citing Rita*, 551 U.S. at 347. A guideline sentence for all the defendants is not only reasonable, but also it is the correct sentence.

IV.     Applications of the 3553(a) Factors

3553(a)(1): The Nature and Circumstance of the Offense

White collar offenses are serious and require sentences that reflect the seriousness of the offense. *See United States v. Jones*, 887 F.2d 492, 495 (4th Cir.1989) (mail fraud is a "very serious crime"). In 2002, Congress enacted the White Collar Crime Penalty Enhancements Act which, inter alia, instructed the Sentencing Commission to consider whether the sentencing "guidelines and policy statements ... are sufficient to deter ... [white collar] offenses" and to "modify the sentencing guidelines" accordingly. *See* Pub.L. No. 107-204, § 905(b)(1),(2). In response, the Commission increased the penalties and enhancements for certain white collar offenses. *See* 68 Fed.Reg. 2615-01 (2003); *see* also U.S.S.G. § 2B1.1 (2001) (setting forth the 2001 economic crime

sentencing reforms which increased the guideline penalties and enhancements for white collar offenses). "One of the goals of the entire guidelines regime was to minimize discrepancies in the treatment of 'white collar' and 'blue collar' offenses." *United States v. Thurston*, 358 F.3d 51, 80 (1st Cir. 2004), *vacated by Booker*.[2] One of Congress' primary objectives in enacting the current federal sentencing scheme. *See* U.S.S.G. ch. 1, pt. A, § 3 (stating that one goal of the Sentencing Commission was to eliminate the pre-guidelines inequity of "punishing economic crime less severely that other apparent equivalent behavior"); Pub.L. No. 107–204, § 905(b)(1)(2) (2002) (instructing the Sentencing Commission to review the guidelines to consider whether they "are sufficient to deter ... [white collar] offense ...").

The defendants' crimes were serious and long-running, the crimes have been the basis for the Conspiracy/Enterprise to operate for generations. These crimes not only affect businesses in the lending and insurance, but also every customer of these business by driving up prices; additionally the crimes effect the taxpayers and programs that are designed to assist the indigent, the disabled and the elderly. Through the years, the Conspiracy/Enterprise has become ever more corrupted by fraud. This fact is underscored by the fact that each of the defendants plead guilty to a range of conduct that spanned years. The nature and circumstance of these crimes, dictate that a guideline sentence is appropriate.

### 3553(a)(1): History and Characteristics of the Defendants

The Government does not dispute the individual characteristics of the defendants as outlined in the presentence reports. The defendants were born and raised within the

---

[2] *See*, J. Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L.Rev. 1, 20-22 (1988), and U.S.S.G. ch. 1, pt. A, introductory cmt.) (noting that the guidelines were an attempt by the Sentencing Commission to address discrepancies and inequities between sentences for white-collar crimes and other crimes).

Conspiracy/Enterprise.[3] Whatever, mitigation this provides does not excuse the pattern of criminal acts the defendants, moreover, compounds it when the pattern is being repeated with the children in Murphy Village. The history and characteristics inform the Court of the backgrounds, but in and of themselves cannot absolve the criminal actions that each of the defendants plead guilty to having committed.

<u>3553(a)(2)(A): The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect of the Law, and to Provide Just Punishment for the Offense</u>

    i.       Reflect the Seriousness of the Offense

Each defendant participated in a pattern of criminal conduct through their membership in the Conspiracy/Enterprise that lasted over a period of years. The seriousness of the crime is the pattern of activities that spread over a period of time. *See, United States v. McNair*, 441 Fed.Appx. 214, *1 (4th Cir. 2011) (the district court correctly denied a variance due to the fact that the defendant had engaged in a "substantial pattern of fraud"). The fraud is ingrained in the Conspiracy/Enterprise and the sheer mass of so many individuals breaking the law in so many different manners – demonstrates the seriousness of the offense. There is a coordinated criminal Conspiracy/Enterprise that takes advantage of any weakness that it finds. A guideline sentence would reflect the seriousness of the pattern of crimes that each defendant plead guilty to having committed.

---

[3] As detailed in the presentence reports many of these defendants have concerns with taking care of sick family members, while the Government sympathizes with these issues it would object to these being basis for downward departures. "Because the Commission discouraged departure on the basis of family ties and responsibilities, departures pursuant to § 5H1.6, is permitted only upon a finding that the defendant's ties or responsibilities are extraordinary." *United States v. Wilson*, 114 F.3d 429, 433-34 (4th Cir. 1997). *See Elliott v. United States*, 332 F.3d 753, 768-69 (4th Cir. 2003) (defendant being the primary caregiver to chronically ill family member not sufficient for a departure); *United State v. Rybicki*, 96 F.3d 754, 759 (4th Cir. 1996) (reversing district court for considering a defendant's wife and child's medical problems). The fact the defendants had these obligations when they decided to break the law and while unfortunate does not provide a basis to excuse the behavior.

    ii.       Promote respect for the law[4]

The sheer duration of this conspiracy emphasizes the need that sentences imposed in this case must promote the respect. The pervasive nature of the criminality of the defendants shows the lack of a respect for the law.

    iii.      Provide a just punishment

A just sentence would be a guideline sentence for each defendant. In working through the various issues of the case and coming up with the stipulations used, it was determined by all partners in the prosecution that much more good would come of having these 22 defendants receiving 3 or 4 years each, as opposed to 3 or 4 defendants receiving 22 year each. This is because, as detailed below, if all defendants receive a guideline sentence there is a chance that the Conspiracy/Enterprise will take notice and change their criminal ways in the future.

3553(a)(2)(B): To Afford Adequate Deterrence to Criminal Conduct

A non-guideline sentence would not only embolden members of this Conspiracy/Enterprise to continue the culture of criminality, but also would be an express approval of the wide spread fraud's continuation. Courts have recognized that "white collar crime … requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). Similarly, "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk

---

[4] Only two prosecutions are known to have occurred within this community, both occurred in the 1990s, one was federal that involved cars being fraudulently being brought across state lines, and the other was a state prosecution that involved tax evasion. In both cases, the defendants received probationary sentences. Such sentences seem to have not promoted any respect for the law within the Enterprise.

of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id*. The Guidelines specifically state that a sentence should provide "adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). "We are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence." *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (vacating a probationary sentence in a 3 million dollar health care fraud scheme).

General deterrence is an important factor in white-collar cases, where the motivation is greed and little or no imprisonment is given - courts have found such sentences are not punishment for the offenses as they do not promote respect for the law, and will not do much to deter similar criminal activity by others. General deterrence – that a sentencing sends a message to others who do not know the defendant but who hear of the crime will take heed and change their ways. While the Government believes that this case will provide general deterrence – specifically to the other insurance agents, car salesmen, tax preparers, doctors, and others who fraudulently join criminal conspiracies for quick money; it is the belief that specific deterrence in this case will serve to further the aims of 3553(a)(2)(B) and justice.

Each defendant is known throughout the Conspiracy/Enterprise, each defendant's case is being watched by other members of the Conspiracy/Enterprise, and a Guideline sentence for each defendant will act a direct deterrence for future crimes of the Conspiracy/Enterprise. This is an Conspiracy/Enterprise that is an insular community where everyone knows everyone else. In Murphy Village, the fact that numerous people receive active prison sentences will resonate, the fact that:

**JOHN U. CARROLL**
**ANN CARROLL**
**COURTNEY CARROLL**
**JAY G. CARROLL**
**MARY C. CARROLL**
**MARY RITA CARROLL**

**RALPH CARROLL**
**MARY GORMAN**
**TINA GORMAN**
**ANN MACK**
**THOMAS MARTIN MACK**
**RACHEL MCNALLY**
**BILLY O'HARA**
**JIM O'HARA**
**WINNE O'HARA**
**HUGH RILEY**
**MELISSA RILEY**
**TRACY RILEY**
**BETTY SHERLOCK**
**M. LISA CARROLL SHERLOCK**
**MICHAEL P. SHERLOCK**
**PATRICIA SHERLOCK**
**PATRICK SHERLOCK**
**SANDRA SHERLOCK**
**ANN F. SHERLOCK**

receive guideline sentences will be known for generations to come;[5] however, a non-guideline sentence or probationary sentences would reverberate even louder and would be tantamount to the Court specifically minimizing and even condoning the fraud that plagues this community.

In this case, more than any other case – deterrence is paramount. This is an Conspiracy/Enterprise where all members know each other, what the Court gives each defendant will be known by the Conspiracy/Enterprise and will have a direct impact on the Conspiracy/Enterprise.

---

[5] The Government notes, that it asked for a guideline sentence in the companion cases to this, deviating when appropriate based upon cooperation and/or special circumstances. The Government at time of filing of this memorandum, knows of no special circumstances for any of the named defendants that would justify a non-agreed upon level 19 sentence.

### 3553(a)(2)(C): To Protect the Public from Further Crimes of the Defendant

The widespread nature and longevity of the crimes is indicative of the need for a sentence that is commensurate with each of these defendants' crimes. The crimes of these defendants affect society as a whole by driving up insurance and financing cost, as well as depleted funds to care of the indigent, the sick and the old. If these defendants receive a non-custodial sentence, then they will be encouraged to continue their criminal ways.

### 3553(a)(2)(D): To Provide the Defendant with Needed Educational, Vocational Training, Medical Care

*Tapia v. United States*, 564 U.S. 319, 322 (2011), a court cannot impose or length a sentence solely for the defendant's rehabilitation, however there is "no error by discussing the opportunities for rehabilitation." *See United States v. Lemon*, 777 F.3d 170, 173-75 (4th Cir. 2015) (permissible consideration is the need for rehabilitation). The presentence reports reflects a dearth of education. The Travelers participate in a practice of preventing their children from receiving education, most children are withdrawn from school between the third and seventh grades. As the Court heard in the plea colloquies and has read in the presentence reports, most of these defendants have a very low formal education. A guideline sentence would allow the defendants to receive remedial education and possibly a high school diploma. Such influx of education into Murphy Village can only have positive effects on the community as a whole.

### Section 3553(a)(6) provides that a sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

"One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). A district

court's concern about the disparate sentences of co-defendants is not an appropriate basis for a downward departure, Section 3553(a)(6) is the Guidelines' attempt to eliminate unwarranted sentencing disparities nationwide. *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996). *See, United States v. Ellis*, 975 F.2d 1061, 1066 (4th Cir.1992) (finding the circuits unanimously agree that disparate sentences among codefendants is an impermissible ground for departure.)[6] The defendants have already received a benefit through their attorney negotiations with the Government and stipulations with loss amount. A non-guideline sentence at this point would put the defendants as having a disparate sentence from others across the country that were convicted of racketeering.

V.  Special Conditions of Supervision

The Government would ask the Court to enact a special condition of supervision for each defendant.[7]

> "In addition to the defendant's general obligation to abide by federal, state, or local law, the defendant must comply with S.C. Code § 59-65-10, which requires the parents or guardians to enroll their children in public school or other program approved by the State Board of Education and verified by United States Probation."

As detailed above the Conspiracy/Enterprise withdraws their children from school at early ages which makes the children dependent on the Conspiracy/Enterprise for life. Enrollment in school is required by state law in SC, under S.C. Code § 59-65-10. Specifically, parents and

---

[6] *See United States v. Wogan*, 938 F.2d 1446, 1448-49 (1st Cir.1991); *United States v. Joyner*, 924 F.2d 454, 459-61 (2d Cir.1991); *United States v. Higgins*, 967 F.2d 841, 845 (3d Cir.1992); *United States v. Pierce*, 893 F.2d 669, 678 (5th Cir.1990); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir.1991); *United States v. Dillard*, 43 F.3d 299, 311 (7th Cir.1994); *United States v. Torres,* 921 F.2d 196, 197 (8th Cir.1990); *United States v. Vilchez*, 967 F.2d 1351, 1353-55 (9th Cir.1992); *United States v. Garza*, 1 F.3d 1098, 1101 (10th Cir.1993); *United States v. Hendrieth*, 922 F.2d 748, 752 (11th Cir.1991); *United States v. Williams*, 980 F.2d 1463, 1467 (D.C.Cir.1992).

[7] This is in addition to the condition that the defendants themselves receive remedial education and a high school diploma or GED.

guardians in South Carolina are required to enroll their children in a school or other program approved by the State Board of Education, subject to a $50 fine and up to 30 days in jail. S.C. Code §§ 59-65-10, 20.  Alternatively, a family court may order the child's attendance, and may punish the parents for contempt (up $50 and 30 days) if they fail to comply.  S.C. Code § 59-65-60.  Children may be home-schooled, but only "if the instruction is approved by the district board of trustees of the district in which the children reside." S.C. Code § 59-65-40.  The teaching parent must either have a college degree or have a high school degree and pass an exam.  S.C. Code § 59-65-40.[8] Failure to enroll a child is a misdemeanor, but it is a criminal offense, so an offender failure to comply would violate the defendant's general obligation not to commit any criminal offenses.

VI.     Conclusion

The Government would ask the Court to give a guideline sentence, such sentence achieves all of the sentence factors, it is sufficient, but not greater than necessary and such a sentence is a just sentence, which will have long lasting positive effects on the Conspiracy/Enterprise that the defendants plead guilty to being a part.

                        Respectfully,

                        SHERRI A. LYDON
                        UNITED STATES ATTORNEY

By:    s/Jim May
        James H. May (Fed. ID # (11355)
        Assistant United States Attorney

---

[8] The investigation found that there was fraud in the Enterprise with hiring outsiders to take the exam to allow for home schooling. As a part of the special condition, if any person desires to home school their children, the Government would request that such program be verified by US Probation.